J-A12002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| ESTATE OF ARTHUR M. PETERS, JR., DEC'D, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA, | |
| | No. 1359 MDA 2014 |

Appeal from the Order July 17, 2014
In the Court of Common Pleas of Montour County
Civil Division at No(s): 39-2013

BEFORE: BOWES, DONOHUE AND ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                      **FILED JUNE 17, 2015**

The Office of Attorney General of Pennsylvania, on behalf of the charitable beneficiaries of the Estate of Arthur M. Peters, Jr., challenges on appeal the orphans' court's decision to approve the amount of fees charged by the executrixes of this estate. After careful review, we affirm.

Mr. Peters died testate on September 4, 2011. Mr. Peters, who was a probate and estate lawyer, practiced law for nearly fifty years and amassed a considerable fortune worth approximately $8,000,000. Mr. Peters' wife predeceased him, and the couple had no children. The beneficiaries of Mr. Peters' estate were primarily various charities located in the area. In the will, the decedent instructed that Wendy S. Tripoli, Esquire, be hired as

estate attorney and that her compensation be limited to one percent of the value of the inventoried assets.  The named executrixes under the will were Linda L. Weaver and Holly Greenly, and no limitation was placed on their compensation.

In the first and final account, the estate attorney charged, as mandated by the will, $81,193, and each executrix claimed remuneration of $123,289.  Their compensation was calculated based upon a sliding percentage of the estate assets: 5% of the first $100,000; 4% of the next $100,000; and 3% of the remainder of the value of the estate.  The orphans' court indicated that this method of calculating fees was almost invariably used by Mr. Peters while he was a practicing probate attorney.

Appellant, as *parens patriae* of the charitable beneficiaries, was notified of the account and objected to the fees charged by the co-executrixes.  A hearing was conducted.  Ms. Weaver and Ms. Greenly, who were longtime employees of Mr. Peters and worked with him in the estate area, did not keep a log of the amount of hours worked on the estate. They detailed the significant amount of work that they performed on behalf of the estate.  The orphans' court exhaustively outlined the duties Ms. Weaver and Ms. Greenly performed on behalf of this estate, and we rely upon its recitation of their efforts in rendering our decision.  Trial Court Opinion, 10/2/14, at 6-10, 14-17.  After the hearing, the orphans' court denied

Appellant's exceptions and confirmed the first and final account. This appeal

followed. Appellant raises the following contentions:

> I. Whether the Orphans' Court erred in finding the co-executrixes' combined fee of $246,579 to be reasonable where they did not keep contemporaneous time records or provide other evidence to sufficiently support their fee?
>
> II. Whether the Orphans Court erred by allowing the co-executrixes to charge against the estate for legal work they performed where (a) the testator's former law partner Wendy Tripoli was separately being paid one percent of the value of the estate to perform legal work and (b) co-executrix Greenly was a paid employee of Attorney Tripoli?

Appellant's brief at 4.

Our standard of review of an orphans' court ruling is as follows:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*In re Estate of Fuller*, 87 A.3d 330, 333 (Pa.Super. 2014) (citation

omitted).

In connection with fees charged by fiduciaries, the Probate, Estates,

and Fiduciaries Code has a specific provision, which outlines: "The court shall

allow such compensation to the personal representative as shall in the

circumstances be reasonable and just, and may calculate such compensation

on a graduated percentage." 20 Pa.C.S. § 3537. As we articulated in *In re Padezanin*, 937 A.2d 475, 485 (Pa.Super. 2007) (citation omitted), "the basis for determining whether compensation is reasonable under section 3537 depends upon the value of the services actually rendered." The personal representative who is requesting compensation has the "burden of establishing facts which show the reasonableness of their fees and entitlement to the compensation claimed." *Id.* (citation omitted). However, "the determination of whether the executor's fees are reasonable is left to the sound discretion of the Orphans' Court, and we will not disturb its determination absent a clear error or an abuse of discretion." *Id.* (citation omitted).

As outlined by § 3537, there is no requirement that a personal representative keep a time log of each hour spent on estate matters in order to justify his fees, and the personal representative of an estate can charge on a percentage basis. Hence, Appellant's first position cannot be sustained. Additionally, we conclude that Ms. Weaver and Ms. Greenly satisfied their burden of proving that their fees were reasonable and that they actually rendered services to the estate equal to the amount charged.

As reported by the orphans' court, the co-executrixes "detailed their extensive work and the high quality of their work in their testimony." Trial Court Opinion, 10/2/14, at 7. The court also noted that the co-executrixes had a "wealth of knowledge about Attorney Peters' assets and extraordinary

expertise in administering estates." *Id*. The orphans' court outlined that the "co-executrixes themselves did most of the actual legal work for the administration of the estate in addition to gathering, marshaling, and accounting for the assets and liquidating and distributing the assets and preparing legal documents and tax returns, as well as recording and collecting notes." *Id*. at 6-7.

Significantly, Ms. Weaver and Ms. Greenly were able to sell the house at its appraised value without paying a broker's fee. Additionally, they traveled to New York to sell his yacht, and conducted meetings with gun dealers to appraise and liquidate Mr. Peter's firearms collection, with coin dealers to sell his coin collection, with antique dealers to sell his antique collection, and with art dealers to liquidate his art collection. Thus, the co-executrixes performed significant work in addition to the duties associated with administering a sizeable estate that included unique assets.

Since Mr. Peters had no children, they also attended to many duties that a family would undertake. They made funeral arrangements and cleaned and inventoried the house. Since the basement had flooded, a large amount of cleaning was required for three months, and Ms. Weaver and Ms. Greenly were helped by family members. The co-executrixes arranged for memorial plaques for Mr. Peters at the charities that benefitted from his largesse. Thus, contrary to Appellant's position, the orphan's court did not affirm the charged fees based solely upon the close personal relationship

that Ms. Weaver and Ms. Greenly enjoyed with the decedent. Additionally, the orphans' court did not write a fee structure into the will, *i.e.*, the one used by Mr. Peters in his estate practice.

Appellant also claims that the orphans' court improperly relied upon the fact that the co-executrixes performed legal work because there was an estate attorney who charged fees. However, in this connection, the orphans' court relied upon the fact that the fee paid to the estate attorney was unusually low compared to the size of this estate.

In light of the evidence produced by the co-executrixes at the hearing, we conclude that the orphan's court committed no abuse of discretion in approving the requested fees. We affirm on the basis of the well-reasoned decision of the Honorable Thomas A. James, Jr. dated October 2, 2014.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/17/2015

IN RE:

ESTATE OF ARTHUR M. PETERS,
JR., DECEASED

IN THE COURT OF COMMON
PLEAS FOR THE 26TH JUDICIAL
DISTRICT, MONTOUR COUNTY
BRANCH, PENNSYLVANIA
ORPHANS' COURT DIVISION

CASE NO: 39 OF 2013

ROBERT P. WILKISON, ESQUIRE, Attorney for Linda Weaver and Holly
Greenly, Executrices of the Estate of Arthur M. Peters, Jr.,
deceased
HEATHER J. VANCE-RITTMAN, ESQUIRE, Attorney for the Commonwealth
of Pennsylvania

October 1, 2014.      JAMES, J.

## OPINION PURSUANT TO PA.R.A.P. 1925(a)

Arthur M. Peters, Jr., Esquire died on September 4, 2011,

leaving a large estate.  Attorney Peters was a very competent

and highly regarded attorney in the Montour County community for

many years.  In his will, he specifically appointed as co-

executrices his two secretaries, who worked for him for almost

fifty (50) years of his legal career.  He put no restrictions on

their fees, although he did limit attorney's fees for the

attorney who handled  the estate.  The co-executrices followed

the same fee schedule that he had used almost exclusively during

his career as an estate and probate lawyer.  They did

extraordinary work, including the legal work, for the

administration of this estate.  Most of the estate was

bequeathed to charities, ironically, some of which were

1

RECEIVED

OCT 1 4 2014

Office of Attorney General
Charitable Trusts

suggested by his friends/secretaries, now, co-executrices. They filed the first and final account. The Commonwealth, as *parens patriae,* filed objections to the fees of these two women, who were the closest thing to daughters that he had. After hearing dated July 7, 2014, this court found that the fees were reasonable *under all of the circumstances* and denied the objections. The Commonwealth appealed.

In its Concise Statement, the Commonwealth alleges five errors. First, it alleges that the executrices' compensation is excessive under the circumstances. The circumstances (extent and quality of work, expertise, knowledge of assets, etc. – see below) more than justify this fee. Second, it alleges that it was error not to require contemporaneous time records. The executrices were credible and outlined their work in detail. Third, it alleges that the percentage fee was not appropriate. The fee was appropriate and the same one used by the decedent in his law practice for almost fifty years.

Fourth, it alleges that it was an abuse of discretion to consider that the co-executrices lacked a retirement plan when working for the decedent and that the decedent made a specific bequest to them. This is part of all the circumstances. It was appropriate to consider. Fifth, it alleges that the estate was double billed because one of the executrices worked for the attorney who did the legal work on the estate. This last

2

allegation of error is disingenuous. The attorney's compensation was not questioned by the Commonwealth. The co-executrices did paralegal work, essentially quality legal work as well as brilliant stewardship of this estate. The Commonwealth only chose to question the compensation of hardworking women of modest means and modest earnings - friends, essentially family of the decedent - despite the facts that are outlined in detail below. The Commonwealth chose to ignore all of the circumstances and the quality of work that these women performed and which the decedent clearly knew they would perform.

At the July 7, 2014, hearing, the estate's witnesses were the two co-executrices. The Commonwealth presented no witnesses or evidence.

In this case the court finds the following facts:

1. Arthur M. Peters, Esquire, a long-time attorney practicing in Montour County, died testate on September 4, 2011. He was a very competent and highly regarded attorney in the community for almost five (5) decades.

2. Attorney Peters died testate leaving a will dated January 28, 2005. The primary beneficiary, his wife, predeceased him in approximately 2009. Thus, the bulk of his estate was bequeathed to various charities and with a much smaller percentage to relatives and friends.

3

3. In paragraph "ITEM X' he stated "It is my desire that at my death Wendy S. Tripoli, Esquire, be retained as attorney by my executrix for the administration of my estate. I hereby direct that the attorney's fee for said services shall be one (1%) per cent of the gross estate, not to exceed One Hundred Thousand ($100,000.00) Dollars."

4. In "ITEM XI" he stated: "I hereby appoint my wife, Georgene H. Peters Executrix of this my last Will. Should my wife, Georgene H. Peters, fail to qualify or cease to act as Executrix, I appoint Linda L. Weaver and Holly Greenly, or the survivor of them Co-Executrixes of this my last Will." He placed no limiting language on the fees.

5. From at least 1964 until a few years before his death, Attorney Peters wrote many wills and handled many estates. Almost invariably, the fee schedule for estate administrators and attorneys was 5% for the first $100,000.00; 4% for the next $100,000.00; and 3% for the balance.

6. Attorney Peters' wife's will was the same as her husband's except with him as primary beneficiary and primary executor. Linda Weaver and Holly Greenly were named alternate executrices.

4

7. From 1964 until the end of his life, the co-executrices were Attorney Peters' secretaries/paralegals/trusted advisors.

8. Co-executrix, Linda Weaver, started working as Attorney Peters' secretary in 1964. For about seventeen (17) years she did his real estate work and estate work. As was often the case with legal secretaries hired in 1964, she became essentially a paralegal. She sat with him and the client when the client interview occurred for administering estates. After the interview, she did the rest of the administration subject to his advice and review. She handled his real estate work in a similar fashion including conducting title searches. In 1980, she became Montour County Register and Recorder. She continued to advise him and help him for the rest of his career.

9. After she left his employment, Linda Weaver continued to assist Attorney Peters. She actually typed the will. She did his title searches and compiled information from his business for income tax preparation. She was very familiar with his family and assets. He asked for advice on charities as beneficiaries, and she (and Holly Greenly) suggested specific charities.

10. Co-executrix Holly Greenly started to work for Attorney Peters in 1975 and continued to work for him for

5

almost thirty-seven (37) years, until his death. Like Linda Weaver, she was secretary/paralegal/trusted advisor. Like Linda Weaver, she handled Attorney Peters' real estate transactions and estate administrations. She administered, with him, about four hundred (400) estates.

11. Holly Greenly was Attorney Peters' named power-of-attorney, although she only started to actually act as such when he needed her within the last year of his life.

12. About three (3) years before Attorney Peters' death, he and his wife started to need caregivers for their personal care and needs. Holly Greenly did most of the work during those three years making day-to-day caregiver arrangements. Attorney and Mrs. Peters did not have any children to help them.

13. Attorney Peters' estate had receipts of $8,029,108.35 and net gains during administration of $505,189.33.

14. Per the fee schedule followed by Attorney Peters for almost fifty (50) years, the Co-Executrices claimed compensation of $123,289.50 each.

15. Attorney's fees were $81,193.00 or 1% as directed in the will.

16. The co-executrices themselves did most of the actual legal work for the administration of the estate in addition to gathering, marshaling, and accounting for the assets and

6

liquidating and distributing the assets and preparing legal documents and tax returns, as well as recording and collecting notes.

17. The co-executrices put the mandatory advertising of the estate in the newspaper and sent notices to the beneficiaries.

18. Attorney Peters had never kept time records for estate administrators/executors or attorneys. Thus, the co-executrices did not keep particular time records, although they detailed their extensive work and the high quality of their work in their testimony.

19. The co-executrices had a wealth of knowledge about Attorney Peters' assets and extraordinary expertise in administering estates.

20. On the day Attorney Peters died, Holly Greenly was the first one called. She immediately called Linda Weaver. They contacted the law office and made funeral arrangements.

21. The co-executrices went to the bank and inventoried Attorney Peters' safe deposit box and inventoried the contents, including coins, judgment notes, and bonds.

22. The co-executrices emptied and inventoried his desk contents, including two judgment notes from a debtor of Attorney Peters. Because of their legal expertise and

7

knowledge of the facts, they were able to record the two judgment notes and collect the judgment from a forgotten debtor in the amount of $47,509.69.

23. The co-executrices themselves cleaned and inventoried Attorney Peters' house. The basement had been flooded and required extensive cleaning. This effort lasted almost every day for three months and included work by the executrices' family.

24. The co-executrices themselves opened an estate for Georgene (Attorney Peters' deceased wife) for miscellaneous assets that were still in her name only and made arrangements to transfer assets from Georgene's estate to Attorney Peters' estate. They were not paid for this.

25. The co-executrices met with Attorney Peters' financial managers on many occasions to discuss strategies for handling the funds. The largest asset was FNB stock. Additionally, there was other stock that needed monitoring. The administration of the estate was during the recessionary period following the bank collapses in 2008. The co-executrices were on the phone up to 2 or more times each day for several months making investment decisions. They followed the stocks and researched them in conjunction with the brokers. As a result of these efforts, driven by the co-executrices efforts, persistence, diligence, and

8

knowledge, losses were averted and the estate flourished and made significant gains.

26. The co-executrices made arrangements to liquidate a county retirement fund and two vehicles.

27. The co-executrices were able to sell the real estate at its appraised value without a broker and broker fees because of their legal knowledge and connections within the community.

28. The co-executrices had many long meetings with gun dealers to inventory, appraise, and liquidate Attorney Peters' extensive firearms collection.

29. The co-executrices had many long meetings with coin dealers to inventory, appraise, and liquidate Attorney Peters' extensive coin collection.

30. The co-executrices had many long meetings with antique dealers to inventory, appraise, and liquidate Attorney Peters' antique collection.

31. The co-executrices arranged for Attorney Peters' artwork to be placed on consignment and sold.

32. The co-executrices (primarily Holly Greenly) made trips to the New York State to secure and eventually sell Attorney Peters' yacht.

33. The co-executrices never submitted travel expenses.

9

34. The co-executrices (primarily Holly) prepared the federal tax return on software she had.

35. The co-executrices hade arrangements for an accountant to prepare the first and partial account. They will be filing a final account at the conclusion of this litigation.

36. The co-executrices made arrangements for memorial plaques and recognition of the Peters' gifts to be placed at Danville Recreational Center, Mercersburg Academy, the Danville Library (Thomas Beaver Library), and Sunnybrook Park.

37. Attorney Peters clearly intended for these co-executrices to receive an executrices' fee in the amount they claimed and in accordance with the fee schedule that he used for hundreds of estates for almost five (5) decades.

The issue before the court is whether the co-executrices' fees are reasonable in the circumstances where they provided significant services and expertise, where they followed the fee schedule which the decedent (a distinguished estates attorney) followed for fifty years, and where he placed no limits on the fees in his will although he did so for attorneys' fees. The court finds that the fees are reasonable *under these circumstances.*

10

Pennsylvania law gives us statutory and case law guidance. "The court shall allow such compensation to the personal representative as shall in the circumstances be reasonable and just, and may calculate such compensation on a graduated percentage." 20 Pa.C.S.A. § 3537. (Emphasis supplied).

"The 'basis for determining whether compensation is reasonable [under section 3537] depends upon the value of the services actually rendered.' In Re Estate of Geniviva, 450 Pa.Super. 54, 675 A.2d 306, 312-13 (1996)(citing In Re Estate of Rees, 425 Pa.Super. 490, 625 A.2d 1203 (1993). In addition, personal representatives seeking compensation from estate assets bear 'the burden of establishing facts which show the reasonableness of their fees and entitlement to the compensation claimed.' Id. At 313 (quoting Estate of Rees, supra at 1206). Finally 'the determination of whether the executor's fees are reasonable is left to the sound discretion of the Orphans' Court, and we will not disturb its determination absent a clear error or an abuse of discretion.' Id." In Re Padezanin, 937 A.2d 475 (Pa.Super. 2007). See also In Re Estate of Harper, 975 A.2d 1155 (Pa.Super. 1155).

In In Re Reed's Estate, 341 A.2d 108, 462 Pa. 336, 340 (Pa.Super.1975), the court stated that "we have held that as a matter of convenience, the compensation of a fiduciary may be arrived of by way of percentage…." (citations omitted). "This

11

test, however, is merely a 'rule of thumb," the true test being what the services were worth. Therefore, it follows that where there is evidence that the services are actually worth more or less than what is prima facie reasonable, as, for example, where the fiduciary performed extraordinary duties … or where the performance falls below accepted norms …, the amount of compensation may be increased or decreased accordingly." Id.

In this case, the co-executors, in the circumstances, did extraordinary work, as Attorney Peters knew and expected they would. He essentially directed that they receive these fees, knowing that they would follow his own fee schedule and knowing that their personal knowledge of his assets and financial affairs and their expertise would be essential to preserving the complex estate for the heirs. He also knew that they had served him well for decades at modest pay and that they deserved the full fee according to his own fee schedule.

It is crystal clear that Attorney Peters intended the co-executrices to be compensated the same fee on the same regular schedule that he used for almost five (5) decades as an estates lawyer. These two women were named as alternate executrices in both his wife's will and his will. He knew that they would be administering the estate. He specifically did not limit their fee, although he had done so with attorney's fees. He knew that there was a lot of work to do in this estate and that these two

12

women were privy to his financial affairs and also were his friends and trusted advisors. He knew they were competent and trusted estate administrators and paralegals. He knew they would preserve the estate for the beneficiaries.

Importantly, he knew that the charities that he named, some at his co-executrices suggestions, were receiving significant amounts of money. It is inconceivable that such a generous man would have been less than very generous with the two women who were his friends, employees, advisors, and confidants for a total of almost fifty (50) years. One co-executrix started at a pay of $35.00 a week. It is inconceivable that now he would want these charities supposedly protected by the Commonwealth from two women who worked for him for years, were loyal to him, were paid modestly, and who used their hard work, expertise, and savvy to protect the estate so competently.

Moreover, they in fact worked very hard to protect and administer this estate. The amount they are claiming to be paid is justified alone by the expertise they used to collect the judgment notes and, importantly, to shepherd assets through the fog of the recession and, in fact, realize a gain for the estate in a very difficult financial environment. These two diligent, conscientious women almost perfectly administered a large and difficult estate, considering not only the fund management, but the gathering, preservation, and liquidation of many assets:

13

coins, vehicles, a yacht, real estate, personal property, stocks and bonds and judgment notes. They actually knew how to collect the judgment notes legally and did so with their legal expertise. They knew how to prepare and serve and file all of the documents necessary for the proper administration as would any good lawyer or bank trust officer. They were super-administrators - doing not only the gathering, preservation, liquidation, and distribution of assets, but with personal knowledge of the decedent and his family. They used their expertise as paralegals extraordinaire to enhance the estate for the beneficiaries. This court cannot imagine that these charities would begrudge two women of seemingly modest means a fee intended to be paid to them by a loyal employer and friend.

At the conclusion of the hearing it was clear that these two women had earned the fee they claimed and that the fee was very reasonable under the circumstances. The court stated the following:

> I appreciate the fact the Commonwealth is in here to represent charities because I think it serves a good purpose because there's lots of times inequities in estates that have to be looked over. I don't think there are any in this one.
>
> Let me explain why. I practiced law before I became Judge for 26 years and I did estates and I did all kinds of general practice and I had people in my office who I tried to pay as well as I could, but running a practice was difficult sometimes. We've heard already that there wasn't any pension plan, particularly in the early days with Ms. Weaver.

14

We also know, and I think I would point out, yes, they don't have a law degree but they do have the expertise, particularly the ones that end up running offices like this and probably have lots of times. I'm not necessarily saying in this case more expertise than Art Peters but often times they have more expertise than most lawyers, these slash paralegals. They weren't secretaries, they were paralegals in my opinion. That was always my experience. In fact, sometimes I get embarrassed because sometimes they'd end up knowing more than me. Right in this case we have two people -- I think there's an abundance of reason to justify this fee.

First of all, the expertise of these two people. I think they just took the ball and ran with it. And with an estate this size I think Art Peters knew that they had the expertise to run it seamlessly and do it properly and he was giving that responsibility. The phrase that sticks out in the statute is "in the circumstances." And I think in the circumstances is crucial here. In the circumstances we have two people who in my opinion sounds like they were akin to, if not daughters, family members of some sort during the time I mean that they were associated with Art Peters who I think was a sole practitioner for most of his career until he brought Wendy Tripoli in at the end. And it seems to me that he limited the attorney's fees to one percent or a hundred thousand dollars. If he were so inclined to limit the executor's fees, he would have done it.

Second of all, habit, custom, tradition, that sort of thing, his fees, as is the case with most attorneys of his generation, in particular, were based on percentages and they didn't vary from it. We heard testimony to that effect. So it would appear that his intent in writing this will is there be no variation from the percentage setup of five, four, three, and that would have been his intent. I know in wills and competency it's knowing whose the object of your affection and whose going to inherit and knowing that I think there's an analogy to be made here in that the object of his grace would be his right-hand men, so to speak, right-hand women, for in Holly's case 33 years

15

slash 37 and in Linda's case I can't count that high, over 40.

And then when you take into account the estate is not one of those estates where it always annoys me with the banks would get a fee based on a straight percentage and all we were dealing with was a bank account that they have to deal with. Here we're dealing with soup to nuts. The soup meaning his death and actually before his death, but finding out about the death, making the funeral arrangements and doing everything.

I think the fact that he limited the percentage of Wendy, the attorney, to one percent or a hundred thousand dollars, he was probably taking into account that he knew that Linda and Holly would be doing all the work. I think I can go on and on with the facts here. Just the trust he had in these two women, the fact that he would even consult with them on what charities to recognize, the fact that he would place so much trust in them, the fact that they did have so much work to do, I think that the hourly rate or keeping track of hours I know is something a lot of the traditional ones, the old-timers did not do, didn't start until later. But that was his habit and of course he passed that habit on to them.

Of all the people that I have heard about and the other beneficiaries most of whom were relatives or neighbors, but they weren't entrusted with the obligations that these two had. I'm not sure if there's anything else I have missed. I think there is because I could go over the fact -- I think the fact that they had the expertise to figure out what to do, the blue note, in particular, just showed how much trust he had in them. I mean how many executors would figure that one out and be able to record it and pursue it. The fact that they would know how to deal with FNB and the representatives and figure out when to sell stock, when not to sell stock, so you make sure it grew and it look it grew about twice, it doubled.

Just that in itself everybody should be happy that these two were the executors 'cause I could just see people pushing to sell the stuff so they could get it over with. Even the fact that they waited, frankly,

16

the estate got closed out in a fairly quick period of time, given the size and complexity of it. The complexity was not only with the financial aspect of it, giving the notes, the bonds, where the mortgages were held and so forth, but also with a hundred thousand dollars worth of guns, by God, not to mention the artwork and the coins and so forth, not to mention the house that had to be managed and taken care of.

And I think the fact that they both had intimate knowledge of the workings of his business for what amounts to his entire legal career and the relationships within the family, including taking care of Georgie and taking care of her estate and finishing that up after her death just shows the trust he had in her. So between the trust, the obligations that they had, the expertise that they had, I think the complications with the estate if not -- well, from both the financial aspect and from the personal aspect, I think the fees are just and reasonable in the circumstances. If this were a financial institution with only holdings and stocks and bonds we'd be having another conversation.

July 7, 2014 Hearing Tr. pp. 51-56. (*sic*, as to several words and phrases since this is a quote from the transcript).

In the end, Attorney Arthur M. Peters, Jr., intended that the two women, whom he paid modestly for almost fifty years of employment, service, and friendship, should be paid the fee based on a schedule that he routinely used for almost fifty (50) years in his law practice. The co-executrices worked unusually hard to administer this estate. They administered Georgene's estate as part of the process. They used their personal knowledge of the assets and their unusual expertise as

17

administrators to preserve assets and produce gains under difficult circumstances.

*In the circumstances* the fees are reasonable and just. The appeal should be denied.

BY THE COURT:

HONORABLE THOMAS A. JAMES, JR., J.

18